**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ALMERIA P. HUFF,**

       **Plaintiff,**

                      **Civil Action 2:20-cv-5093**

   **v.**                   **Judge Michael H. Watson**

                      **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF
SOCIAL SECURITY,**

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Almeria P. Huff, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. +This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 12).  Plaintiff did not file a reply.  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff protectively filed her application for disability insurance benefits in January 2018 and for supplemental security income in May 2018, alleging that she has been disabled since February 1, 2013, due to fibromyalgia, arthritis in her hip, back and knees, discs missing in her neck, headaches/migraines, high blood pressure and sleep apnea.  (R. at 201-11, 242.) Plaintiff's applications were denied initially in March 2018 and upon reconsideration in July

2018. (R. at 54-119.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 142.) Administrative Law Judge Timothy G. Keller (the "ALJ") held a hearing on October 10, 2019, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 40-53.) A Vocational Expert ("VE") also appeared and testified. (*Id.*) On November 12, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 13-39.) The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.)

## II. HEARING TESTIMONY

The ALJ summarized Plaintiff's relevant hearing testimony as follows:

[Plaintiff] presented to the hearing in a walker and said she uses this all the time, having previously used a cane. [Plaintiff] alleged that Dr. Kistler referred her to a walker. [Plaintiff] said the knee doctor looked at the discs and said he was not going to [do] surgery on her because she was flared from head to toes. [Plaintiff] said her fibromyalgia is worse in the winter and during stress. [Plaintiff] said her hands are numb and hurt and she has trouble with buttons and zippers. [Plaintiff] alleged that the chips in her neck hurt and she has to be careful in movements. [Plaintiff] alleged daily migraines. [Plaintiff] alleged staying to herself and going to the grocery store in the morning. [Plaintiff] said [she] cannot stand noise and said her grandchildren are loud and hyperactive. [Plaintiff] was then asked about her reports in the record about babysitting these grandchildren and said that they moved out in June 2019. [Plaintiff] said she wishes her daughter stayed, but said she was stressed with all the grandchildren around. [Plaintiff] said she can sit for 1-2 hours before needing to stand up and stretch. [Plaintiff] said she loses notes she takes to help with her memory.

(R. at 22.)

## III. MEDICAL RECORDS

The ALJ summarized the relevant medical records as follows:

As for [Plaintiff's] knee impairment, she complained of bilateral knee pain for a year at her 9/2/15 orthopedic evaluation. [Plaintiff] reported pain right worse than left with some benefit form [sic] an injection in the right knee. [Plaintiff] complained of difficulty with stairs and feelings of instability after being on her feet for a long time. [Plaintiff] was noted to be in no acute distress, awake and oriented

2

with an appropriate mood and affect. Notably, she was ambulating with a normal gait and appropriate balance. Physical findings were quite mild with no edema, effusion, or obvious deformity, and with full range of motion, normal strength against resistance, no instability, normal neurovascular findings and only medial and lateral joint line tenderness with moderate crepitance. The tests were all negative (McMurray's, Patellar grind and J sign). Right knee x-rays showed moderate tricompartmental degenerative changes. Her left knee magnetic resonance imaging from 8/17/2015 showed high-grade cartilage fissuring and subchondral change involving the patella, lateral trochlear facet and posterior aspect of the lateral femoral condyle. Right knee magnetic resonance imaging revealed multifocal high-grade patellar cartilage fissuring with focal subchondral change, full thickness cartilage loss along the far posteromedial femoral condyle with subchondral change. The impression was bilateral moderate tricompartmental arthritis. Suggested treatment was local steroid injections if anti-inflammatories do not improve symptoms. [Plaintiff] was to lose weight and do range of motion exercises, with a body mass index of 37.44 kg/m2. Surgery would be a last resort with no reference to any "whole body" flaring preventing surgery, in fact [Plaintiff] had no inflammation at the exam, findings were overall mild and conservative treatment recommended with follow-ups only as needed.

[Plaintiff's] right knee magnetic resonance imaging from 11/2/18 indicated: 1. Type II signal degeneration of the posterior horn of the medial meniscus, with posterior medial edge fraying, no traversing meniscal tear identified on today's exam; 2. Mild superolateral subluxation of the patella with some mild to moderate chondromalacia involving the apex and the lateral facet of the patella, involving greater than 60% of total thickness cartilage; 3. Small joint effusion. The left knee magnetic resonance imaging on the same date indicated a diffuse, type 2 signal degeneration of the posterior horn and the body of the medial meniscus with the posterior medial edge fraying, no traversing tear identified on today's exam; tibial roots are intact; small joint effusion; degeneration 1 ligamentous sprain of the tibial insertion of the ACL; mild degenerative changes, with mild chondromalacia of the patella; small subcortical cyst involving the posterolateral lateral femoral condyle. Following this updated imaging, [Plaintiff] had another orthopedic evaluation of both knees just recently on 5/29/19, where she was complaining of worse pain right versus left aggravated by walking and with use of a cane or walker. Physical exam findings revealed that she was an alert oriented very pleasant 52-year-old female. It was noted that she has difficulty rising from a chair. [Plaintiff] has good range of motion of the right and left knee and both hips. [Plaintiff] had no instability of the collateral cruciate ligaments. Her neurovascular status was intact. [Plaintiff] had no meniscal signs. [Plaintiff] had generalized pain about the knee. [Plaintiff] had no deformity. There were no masses about the knee. Imaging compared to previous imaging indicated stability. These noted stability and only mild tricompartmental degenerative change with no significant joint effusion or any other abnormalities. This doctor wrote, ["]I do not see any indication for surgical intervention" and ordered very conservative treatment of weight loss and physical therapy and a

referral to rheumatology given her multiple joint complaints. Once again, findings were quite mild on exam, testing and imaging, with no progression of her mild degenerative joint disease of both knees and only conservative treatment ordered. These exams fail to support the extent of limitations [Plaintiff] alleged due to her need and fail[ure] to support the need for an assistive device due to her knee degenerative joint disease. Notably, this doctor also did not defer needed surgery due to whole body inflammation as she alleged in testimony, with no surgery recommended or suggested by the exam or imaging findings. [Plaintiff] had benefitted from steroid injections with mild findings at other exams even with some positive testing and antalgic gait, but normal strength, intact neurological findings, full range of motion and no instability.

As for [Plaintiff's] bilateral hip degenerative joint disease, imaging also supports these as mild bilateral hip degenerative changes (3/22/18). Imaging of [Plaintiff's] lumbar spine on that same day indicated no significant degenerative disc disease with no fracture or spondylolisthesis.

[Plaintiff] had an initial pain management consultation on 7/11/17 for chief complaints of neck, back, knee and fibromyalgia pain. It was noted by this specialist that the ordered lumbar magnetic resonance imaging came back normal. [Plaintiff] saw her pain management doctor with reduced frequency and some improvement noted with treatment. [Plaintiff] had initially been found to be mildly anxious with cervical paraspinal muscle tenderness and trigger points in the cervical spine and bilateral trapezius muscles; upper extremity strength at 4/5, lower extremity strength at 5/5; intact sensation and strength; positive crepitus with range of motion of knees but no tenderness, edema or erythema to either knee; and generalized tenderness with palpation related to fibromyalgia. [Plaintiff] treated with pain medications and some injections. At her recent exam, she reported pain dropping from 10/10 to 5/10 with medications, saying they help with pain and quality of life, with [Plaintiff] seen on 1/4/19 after a previous visit on 7/20/18. Her depression screen indicated a mild risk for depression. At her 7/20/18 visit, she was alert and oriented x three and mildly anxious. Findings included cervical paraspinal muscle tenderness noted on palpation; trigger points noted on palpation; neurological examination of her upper extremities intact with upper extremity strength decreased at 4/5; neurological examination of lower extremities showed mild decreased sensation to the bilateral lower extremities with numbness and tingling per the patient; bilateral knees have decreased flexion, extension and pain with range of motion, but bilateral knees were without redness or edema with tenderness upon palpation; generalized tenderness upon palpation. Thus, while [Plaintiff] has some abnormal findings on exams, she reported benefit from treatment with decreasing visits. This doctor did complete a questionnaire in his treatment having seen her on 7/11/17 – 1/23/18. He noted diagnosis of herniated nucleus pulposus without myelopathy, fibromyalgia and osteoarthritis. Findings included cervical paraspinal muscle tenderness, upper extremity strength weakened to 4/5 with bilateral trigger points to trapezius muscles and sensory deficits to lower extremities L3-4,5 and

4

positive crepitus to both knees. It was noted that he had used trigger point injections, and ordered epidural steroid injections that were denied by insurance. He included a lumbar spine magnetic resonance imaging that indicated normal for age per the imaging with this doctor noting that he found it normal except for the lumbar facets at L4-5. Thus, [Plaintiff] had near to normal imaging of the lumbar spine. He noted that treatment with Norco and Lyrica was beneficial with [Plaintiff] showing improvement in functioning and quality of life. As for any possible work limitations, he suggested only "difficulty with heavy lifting." Following this questionnaire, the doctor's treatment notes do not suggest significant worsening with [Plaintiff] treating with Norco and Lyrica, with cervical epidural steroid injection and physical therapy ordered but not necessarily completed.

While this doctor did not suggest limitations beyond no heavy lifting, the treatment records and others do support a reduction in [Plaintiff's] exertional level to the light exertional level. This is largely supported by [Plaintiff's] cervical spine degenerative disc disease and some abnormalities with regard to upper extremity strength and some trigger points and overall generalized tenderness caused by her fibromyalgia with aggravation from her obesity. The record does support additional limitations suggested by the findings in these notes and elsewhere. The State agency medical consultants agreed that [Plaintiff] was reduced to a light exertional level residual functional capacity but included some other limitations in consideration of the combined effect of [Plaintiff's] impairments. Consideration of [Plaintiff's] obesity as an aggravating factor also supports some limitation beyond those offered by [Plaintiff's] pain management doctor. To the extent the preclusion to heavy lifting can be considered an opinion, it is persuasive only in generally supporting a light exertional level versus a higher exertional level, although "no heavy lifting" was not defined. Thus, overall, it is not persuasive as the record supports additional limitations beyond the preclusion of heavy lifting, but it was considered along with the exam findings and treatment. I do note that these records reveal that while [Plaintiff] presented in a rollator at the hearing, claiming she uses this all the time, having allegedly previously used a cane, her treatment record often noted a normal gait or antalgic gait and no regular use of any assistive device. The State agency medical consultants found [Plaintiff] capable of work at the light exertional level with less postural limits than adopted in the residual functional capacity along with environmental limits and no need for an assistive device. Evidence at the hearing level and consideration of the exacerbating effect of [Plaintiff's] obesity and her pain complaints support some increased postural limitations from the frequent to the occasional level largely due to knee imaging and findings and her obesity, and environmental limitations as to dust, fumes, gasses and wetness. However, the record supports her ability to avoid hazards in the workplace within the residual functional capacity restrictions above. This is supported by the overall mild imaging with some abnormalities on exam but also many normal findings, her treatment history considering pain management with improvement and other evidence of more intact activities of daily living than alleged in disability reports. Thus, the State agency medical consultants' physical assessments are still overall

persuasive given the adoption of the exertional level and some of the environmental limits as well as the need for climbing and postural limits (albeit increased), with the exceptions of the areas indicated. The suggested limits were supported by the evidence cited at the time and consistent with other evidence at the time. Some more recent evidence supports the need for the different limitations adopted.

Looking at other treatment records in the record, it is noted that [Plaintiff] had a 1/14/16 preoperative evaluation prior to her colonoscopy (with this colonoscopy completed later and was normal), where she had a functional status greater than 4 METS with the ability to climb stairs with no anginal symptoms. [Plaintiff] was awake and alert with many normal findings. [Plaintiff] reported the use of an inhaler for chronic obstructive pulmonary disease but had normal lung findings. [Plaintiff's] pulmonary function tests from 6/24/15 was reviewed and revealed no obstructive deficit by FEV1/FVC criteria, normal lung volumes and moderate reduction in diffusion capacity only. Her blood pressure was 126/93 with [Plaintiff] on ACE inhibitors. [Plaintiff] was cleared for her colonoscopy. At her 3/22/17 emergency department for cough, she reported a history of asthma treated with inhalers, denied smoking, chest pain and shortness of breath. Lung findings were normal on exam and imaging and she treated for acute bronchitis. [Plaintiff] required little treatment for her respiratory conditions, whether asthma or chronic obstructive pulmonary disease, with many normal findings on exams and the mild findings on pulmonary function studies noted. However, a pulmonary limitation has been included in [Plaintiff's] residual functional capacity to cover this impairment.

[Plaintiff] did present with some low back pain complaints on 3/12/16 but had normal range of motion, no edema, some tenderness to the palpation and muscle spasm but no bony tenderness, normal reflexes, a normal gait, and a normal mood and affect with no distress. [Plaintiff] had presented with malaise and weakness on 7/7/16 and was admitted for systemic inflammatory response syndrome, essential hypertension, Gastroesophageal reflux disease, abnormal TSH, uncomplicated asthma and depression, all of which improved with treatment after complete work-up. Apparently, two days after one of her cortisone knee injections, she had some fluid build-up around the left knee which decreased with treatment to mild findings and no pain with hip range of motion. Prior to this temporary illness, [Plaintiff] reported she had been independent with her activities of daily living and functional transfers, independent with homemaking and with ambulation and driving.

On 10/18/17, [Plaintiff] was admitted for what was thought to be a migraine with aura with fibromyalgia flare with stroke ruled out. [Plaintiff] had complete work-up and complete resolution of her symptoms. Her echo revealed an ejection fraction of 65% with evidence of diastolic dysfunction and her brain imaging was unremarkable. Physical findings showed intact strength and sensation.

\*\*\*

[Plaintiff] had a diagnostic assessment on 4/18/18 where she reported living with

her daughter and grandchildren. [Plaintiff] reported good relationships with her parents, all four children and all her grandchildren. [Plaintiff] reported being the caretaker of the family, reporting having no friends but being more focused on her family. [Plaintiff] cited depression tied to physical health issues and being able to do less. [Plaintiff] reported attending church. [Plaintiff] reported above average job attendance and good job performance. [Plaintiff] was well-groomed with good eye contact, full orientation, clear speech, tearful depressed mood but cooperative with normal thoughts. Her nursing assessment indicated generalized anxiety disorder and major depressive disorder mild. [Plaintiff] had a first counseling session on 5/11/18 with many normal mental status exam findings including appearance (well-groomed, good eye contact); normal behavior and psychomotor activity; normal speech; unimpaired reading and writing; normal thoughts, judgment and insight; intact cognition/memory and normal concentration and intelligence. Her major depressive disorder was listed as mild with continued generalized anxiety disorder. The discussion followed on the connection between her physical health concerns and increased anxiety and depression symptoms. Her second counseling session on 6/25/18 indicated that [Plaintiff] presented as positive and focused. Her mental status exam findings were detailed as normal. On 7/12/18 [Plaintiff] reported moderate symptoms triggered by health concerns with [Plaintiff] to focus on the positive activities she can enjoy alone or with family. [Plaintiff] again had normal mental status exam findings and a diagnosis listed as major depressive disorder mild. [Plaintiff] apparently was getting medications from a private doctor. [Plaintiff] was to be transferred as she had little to no need for case management and was linked with a counselor. [Plaintiff] returned to her counselor next on 10/5/18 and was advised as to the importance of consistently engaging in counseling, which she had not been doing. [Plaintiff] reported moderate depression triggered by physical health and was found to have mild major depressive disorder with detailed mental status exam being normal. Apparently, [Plaintiff] was noncompliant with regular treatment, given the request for records from this center through 5/19 and no more records after the overdue 10/5/18 counseling visit suggesting more tolerable mental health symptomology than alleged in disability reports.

[Plaintiff] had begun her short-term mental health treatment as far as services beyond medications only after her 3/6/18 psychological evaluation. While [Plaintiff] initially claimed "I don't do nothin," further discussion revealed that she lives with her daughter who is dependent on her for the care of the grandchildren. In fact[,] [Plaintiff] said that her adult daughter is so dependent on her that she cannot do things without [Plaintiff] "holding her hand." [Plaintiff] reported that she feels her daughter leans on her too much and that she is challenged to help with the grandchildren ages 2, 4 and 6 with whom she lives. Notably, she bemoaned being denied disability again. Her mood/affect was somewhat dysphoric but she had no signs of anxiety. [Plaintiff] had a slow gait and appeared stiff rising from her seat. Normal findings were noted with regard to her speech, thought processes, associations, insight, judgment and social skills. As to reliability of [Plaintiff's]

7

reports, the psychological examiner noted [Plaintiff's] frustration that she had been denied disability benefits, also noting "a concern that she may not have performed optimally on testing." When the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) was administered to assess her intellectual capacities, the examiner again noted again that she "does have some concern that [Plaintiff] may not have been giving optimal effort on testing. [Plaintiff] appeared to give up easily and seemed to rush through items. Thus, it is estimated that overall her abilities fall in the upper ranges of the confidence intervals." [Plaintiff] obtained a Verbal Comprehension Index 72, Perceptual Reasoning Index 71, Working Memory Index 66, and a Processing Speed Index 76. [Plaintiff] earned a Full Scale IQ of 66. According to the psychological examiner, it is estimated that she functions in the upper range of the confidence interval and within the low borderline range. Her type of work indicates at least a borderline level of ability. A relative weakness may be in working memory. [Plaintiff] has poor math skills. No particular intellectual strengths are noted, although her highest score is in processing speed. The Wechsler Memory Scale-Fourth Edition (WMS-IV) was administered to assess [Plaintiff's] current memory functioning. [Plaintiff] earned an Auditory Memory Index 74, Visual Memory Index 78, Visual Working Memory Index 73, Immediate Memory Index 75, and Delayed Memory Index 69. [Plaintiff's] abilities fall in the borderline range. A relative weakness was in an area requiring visual motor perceptual skills with a strength on the Designs subtest. It is estimated that the delayed memory score also fails within the low borderline range, which is the higher end of the confidence interval.

[Plaintiff] was diagnosed with an unspecified depressive disorder and borderline intellectual functioning. The functional assessment noted [Plaintiff's] complaints and symptoms but found her capable of two-step tasks. It noted that her scores were lower than would be expected given that her jobs required her to be responsible for individuals and their care. [Plaintiff's] pain was considered as a distracting factor but she was still found capable of being able to maintain concentration, persistence and pace to perform 2-step tasks. The examiner considered her reported work history of good relationships with clients and no problems with co-workers and supervisors but with [Plaintiff] not forming close relationships with them. [Plaintiff] was noted to be very close to family and extended family and related with good social skills after some initial frustration with the required testing. No limitations were found in this social interaction area. As for managing/adapting, it was noted that [Plaintiff's] reports of increased depression may be related to her denials for disability as well as the pressure to help out her daughter and grandchildren. [Plaintiff] was found to have depressive disorder but no symptoms supporting major depression and with depressive disorder symptoms not severe such that she is still competent to handle work pressures for 2-3 step tasks.

(R. at 22-29. (internal citations omitted).)

8

## IV.    ADMINISTRATIVE DECISION

On November 12, 2019, the ALJ issued his decision.  (R. at 16-33.)  The ALJ found that

Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2018.

(R. at 18.)  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff has not

engaged in substantially gainful activity since February 1, 2013, the alleged onset date.  (*Id.*)

The ALJ found that Plaintiff had the severe impairments of degenerative joint disease in the hips,

degenerative changes in the lumbar spine, degenerative disc disease of the cervical spine,

degenerative joint disease of the knees; asthma and/or chronic obstructive pulmonary disease;

fibromyalgia; hypertension; obesity; borderline intellectual functioning; and anxiety and

depression.  (*Id.*)  The ALJ further found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed impairments

described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 19.)

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is claimant engaged in substantial gainful activity?
2.    Does claimant suffer from one or more severe impairments?
3.    Do claimant's severe impairments, alone or in combination, meet or equal the
      criteria of an impairment set forth in the Commissioner's Listing of Impairments,
      20 C.F.R. Subpart P, Appendix 1?
4.    Considering claimant's residual functional capacity, can claimant perform his or
      her past relevant work?
5.    Considering claimant's age, education, past work experience, and residual
      functional capacity, can claimant perform other work available in the national
      economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally climb ramps and stairs but never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch and crawl; only occasional exposure to dust, fumes, gasses and wetness; retains the ability to understand, remember and carry out simple repetitive tasks; able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

(R. at 21.) The ALJ then found that Plaintiff is unable to perform any past relevant work. (R. at 31.) Then, relying on the VE's testimony, the ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy. (R. at 31-32.) He therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since February 1, 2013, the alleged onset date. (R. at 32.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial

evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r*

*of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the

Commissioner will not be upheld where the SSA fails to follow its own regulations and where

that error prejudices a claimant on the merits or deprives [Plaintiff] of a substantial right.'"

*Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.

2007)).

## VI.   ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ failed to properly weigh the

opinions provided by Charles Kistler, D.O., Plaintiff's treating physician. (ECF No. 13 at

PAGEID ## 1462-1468). Specifically, Plaintiff characterizes Dr. Kistler as "basically the central

hub for [Plaintiff's] physical and mental health treatment," and argues that "the ALJ did not

properly consider whether Dr. Kistler's opinions were supported." (*Id.*) Plaintiff argues that "Dr.

Kistler provided extensive support," and cites Dr. Kistler's treatment notes and a "a detailed

letter documenting his treatment of [Plaintiff] and how [Plaintiff's] various impairments impact

her ability to function." (*Id.* at PAGEID # 1465.) Plaintiff also argues that "[t]he other medical

providers of record also document ongoing physical and mental health opinions that are

consistent with Dr. Kistler's opinions." (*Id.* at PAGEID # 1467.)

In response, the Commissioner argues that "the ALJ's analysis of [Dr. Kistler's] opinions

is supported by the medical evidence and properly followed the factors required by law," as Dr.

Kistler's opinions "lack the supportability and consistency with other evidence in the record required by the regulations for them to be persuasive." (ECF No. 18 at PAGEID # 1476.) With regard to Plaintiff's physical health, the Commissioner argues that Dr. Kistler's opinions were inconsistent with Dr. Sayegh's records from pain management treatment and with orthopedic medical records from Drs. Brewster and Baker. (*Id.* at PAGEID # 1489.) The Commissioner also notes that Dr. Kistler's records did not contain details and often included "normal findings," which the ALJ found "cut against [Dr. Kistler's] supportability." (*Id.* at PAGEID ## 1490-1491.) As to Plaintiff's mental health, the Commissioner argues that Dr. Kistler's opinion of mental disability was inconsistent with records from Plaintiff's consultative examiner and mental healthcare providers, as well as Plaintiff's own work history which contradicted Dr. Kistler's opinion that Plaintiff became totally psychologically disabled in 2005. (*Id.* at PAGEID # 1491.) The Commissioner also argues that "Dr. Kistler's own notes fail to support the mental limitations in his opinion," and concludes that "the ALJ properly concluded that Dr. Kistler's opinions regarding Plaintiff's mental limitations did not have significant supportability and that this appropriately reduced the persuasiveness of the opinions." (*Id.* at PAGEID ## 1492-1493.) The Commissioner also argues that Plaintiff's argument "extends into inappropriately asking the Court to re-weigh evidence when the ALJ's decision is clearly supported by substantial evidence." (*Id.* at PAGEID # 1493.) Plaintiff did not file a Reply brief, so the matter is ripe for judicial review.

As a preliminary matter, the new regulations for evaluating medical opinions are applicable to this case because Plaintiff's claim was filed after March 27, 2017. (R. at 201-211.) *See* 20 C.F.R. § 404.1520c. The new regulation at 20 C.F.R. § 404.1520c differs from the previous regulation (20 C.F.R. § 404.1527) in several key areas. For example, the agency no

longer has a "treating source rule" deferring to treating source opinions. 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132 (Mar. 27, 2017)). Now, under the applicable regulations, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a). Further, while the ALJ must articulate consideration of all medical opinions, the regulations no longer mandate the "controlling weight" analysis or the "good reasons" standard in weighing a treating source opinion. *Compare* 20 C.F.R. § 416.927(c)(2) *with* 20 C.F.R. § 416.920c(a), (b). While the regulations at 20 C.F.R. § 404.1520c refer to the limitations opined by the state agency reviewing physicians and psychologists as "prior administrative medical findings," the Undersigned will refer to them as "assessments" or "opinions" for ease and clarity. § 404.1520c(a), (b). Of note, the ALJ is only required to explain how he or she considered the supportability and consistency factors, which are the two "most important factors" in determining the persuasiveness of a medical source's opinion or a prior administrative medical finding. 20 C.F.R. § 404.1520c(b)(2).

Here, the ALJ discussed Plaintiff's RFC and the weight assigned to the various medical source opinions as follows:

> Looking at [Plaintiff's] treatment history of some rather minimal counseling with some benefit and many normal mental status exam findings, other normal mental status exam findings by a variety of providers, and occasional mention of depression or anxiety by her primary care physician and mild anxiety noted by her pain management doctor, **there is support for anxiety and depressive disorders, with borderline intellectual functioning diagnosed by the psychological examiner, but certainly not the extent of limitations indicated by [Plaintiff's] primary care physician in his medical source statements. His own notes do not support these limitations nor does any of the other evidence.** The State agency psychological consultants also suggested limits on job complexity with [Plaintiff] capable of simple tasks. They suggested limits on pace/production due to some

deficits in attention/concentration in consideration of reported interference from her pain. The reconsideration assessment found her capable of adapting to a static setting without frequent changes as opposed to explanation of changes beforehand and assistance available as needed at times of change on initial consideration. Looking at all the evidence relevant to [Plaintiff's] mental functioning and her treatment history and activities of daily living, **I find the opinion evidence of the State agency psychological consultants persuasive overall**. The evidence does support a reduction to simple work which I have defined as simple repetitive tasks. I agree with the psychological examiner and the State agency psychological consultants that the evidence suggests suboptimal effort on testing with a higher intellectual functioning level than scores indicate. The psychological examiner cited her employment history in home health care, with other evidence indicating that the claimant had also worked as a STNA and a supervisor of home health (9F/3). Her mental status exam findings at her Columbus Area Integrated Services indicated normal intelligence, intact memory and normal attention/concentration among many other normal mental status exam findings. **While the psychological examiner did not suggest pace/production limits, finding a limit to job complexity enough for such deficits, I agree with the State agency psychological consultants who considered affective, anxiety and borderline intellectual functioning impairments and found that some limit is appropriate and thus preclude strict production quotas.** The psychological examiner noted that any deficits in handling work pressure would be covered by a reduction to 2-3 step jobs, but the State agency psychological consultants suggested some limits on change. **Considering all this opinion evidence, I limited her to simple changes, not exactly adopting any of the particular limitations set forth, but relying on the overall evidence in the record.** The record does support some stress deficits but largely related to [Plaintiff's] physical health, stress of needing to help her adult daughter and grandchildren, and the stress of being denied disability. Reducing the job complexity, limiting change and precluding strict production quotas will all serve to lower the stress of her job. The record does not support further reduction or any other mental limitations. **Thus, while the psychological examiner's opinion is persuasive in limiting [Plaintiff] to more simple work and finding no social interaction limitations, some additional limitations not included are supported for the reasons stated. With the exception of these changes, the opinion remains persuasive as to the other areas discussed as they are supported by the objective evidence noted and explanation provided at this evaluation and consistent with other mild to normal mental status exam findings throughout the record. The State agency psychological consultants' opinions are overall persuasive even without a straight adoption of all limitations, with some slight differences between the state agency assessments.** They too cited good supporting evidence and their assessments were reasonably consistent with other evidence in the record including hearing level evidence. The final residual functional capacity limitations had some slight changes when considering the entirety of the record that do not warrant finding the State agency psychological consultants' opinions unpersuasive as a result. **These opinions are**

14

**in sharp contrast to [Plaintiff's] primary care physician who checked that she would be unable to function in nearly all work-related areas 26%-50% of the workday/week per the form's definitions. The extent of these limitations [is] simply not supported anywhere in the record including the doctors' own records.** He continued to prescribe psychotropic medications himself rather than defer to a psychiatric specialist which is inconsistent with the limitations he alleged. His wrote that [Plaintiff] is unable to handle stress even while medicated and in counseling, yet his own notes suggest stability with many notes reflecting no mental health complaints. **There is nothing in his own notes to support the extent of limitation he alleged in any of his medical source statements.** The psychological evaluation finding less limitation is inconsistent with this primary care physician's assertions of disabling mental impairments. The State agency psychological consultants also suggest far less limitation and they had the benefit of Dr. Kistler's notes as well as other evidence in the record that does not support that much limitation. **Thus, none of this doctor's opinion evidence is persuasive given the overwhelming evidence that she is not as limited as he suggests, the objective mental status exam findings throughout the file supporting this, [Plaintiff's] minimal need for case management services or counseling and improvement with the mental health care she did receive, and her activities of daily living being the family caregiver helping her daughter and babysitting grandchildren who lived with her most of the record and getting along with her extended family.**

(R. at 29-31 (internal citations omitted; emphasis added).) The ALJ also discussed Dr. Kistler's

specific opinions in great detail, as follows:

[In November 2017], in a brief statement by Dr. Kistler including diagnoses without findings or support, with treatment history back to 9/2/05, this doctor checked that [Plaintiff] was physically and psychologically disabled back to 9/2/05. He had last seen [Plaintiff] on 11/20/17 at this point. **In complete contradiction to the doctor's medical source statement of physical and mental disability, [Plaintiff] was able to work home health care jobs for years well after this date even up to substantial gainful activity levels.** By her description she was working in the home health care field with clients and even some supervisory experience which the vocational expert found to be at the skilled level. **This opinion is not persuasive as on an issue reserved to the Commissioner and furthermore is unsupported by the doctor's own records and inconsistent with other evidence of her ability to work at substantial gainful activity, objective evidence and other opinion evidence finding work ability within specific limitations.**

Looking at Dr. Kistler's own treatment notes, Exhibit 4F revealed rather mild cervical spine magnetic resonance imaging findings on 2/6/17 with normal alignment, normal facet joints, preserved disc height at all level and only a shallow posterior slightly broad protrusion at C4-5 approximating the anterior cord but not

15

causing significant cord compression or canal stenosis. OSU cardiology notes were included, which indicated that [Plaintiff] was asymptomatic except for some with dyspnea with activity likely due to obesity (BMI of 39) and deconditioning. Her echo was normal with mild diastolic dysfunction with no symptoms of heart failure. Medication adjustments were ordered. [Plaintiff] was encouraged to increase physical activity, ideally 30 minutes 5 days a week. Dr. Kistler's notes indicated stability in areas treated, with the hip, knee, back and neck having some abnormalities. However, **overall these notes contain few detailed findings and there are many notes of stable status regarding [Plaintiff's] hypertension, asthma/chronic obstructive pulmonary disease, depression and anxiety.** There are many notes that [Plaintiff] was treating her pain complaints with Dr. Sayeth, her pain management specialist and whose notes were more detailed as previously discussed. Dr. Kistler's records do contain some records forwarded such as [Plaintiff's] right hip x-rays from 6/11/18 indicating right hip degenerative changes only and the knee magnetic resonance imaging previously indicated. In addition to Dr. Kistler's previous unpersuasive opinion that [Plaintiff] was physically and mentally disabled back to 2005 despite a considerable work history including substantial gainful activity, he again finds her significantly limited both physically and mentally. He includes a letter dated 8/6/19 which focuses largely on [Plaintiff's] self-reports of symptoms and limitations and less on objective evidence. He states that her major diagnoses for her disabling conditions are degenerative disc disease of the cervical spine, degenerative joint disease of the hip, degenerative joint disease of the knees, fibromyalgia and generalized arthritis of multiple sites, bilateral carpal tunnel syndrome of the wrists, chronic pain syndrome, anxiety, neurosis, and depression. While [Plaintiff] is documented as having some of these conditions, her imaging as a whole is mild as are her objective findings as previously discussed. Dr. Kistler was not the primary doctor for managing her degenerative disc disease/degenerative joint disease as she had been treating with a pain management specialist with improvement. Dr. Kistler mentions carpal tunnel syndrome which appears in 2014 followed by an apparently successful surgery given no complications, no follow-ups, and no request for additional/new treatment. He mentions significant weakness in her hands and difficulty with self-care which is not documented in the record. Looking at the specific limitations he checked, he finds she is able to lift no weight frequently and only 5 pounds occasionally. He finds her upper extremities limited to occasional reaching, handling and fingering. He limited her to standing only 5-10 minutes at one time up to 1-1.5 hours total daily; walking 5-10 minutes at one time up to 30 minutes to 1 hour total daily; and sitting 20-30 minutes at one time no more than 2-3 hours total daily. Even though he found her capable of sitting, he limited crouching/squat to never which shows unfamiliarity with disability evaluation as some amount of crouch/squat is necessary to sit. He alleged absences of two or more days per month. He alleged these limits go back to at least 2/1/13. He alleged that this assessment is based on diagnoses of degenerative disc disease cervical spine, degenerative joint disease hips, degenerative joint disease knees, fibromyalgia and generalized arthritis multiple sites, bilateral carpal tunnel syndrome and chronic

pain syndrome. **Looking at this opinion itself, little objective evidence is cited in support and that which is cited is not supportive of the extent of limitation Dr. Kistler indicated. He notes abnormalities in general with little detail in his notes, and he was not primarily caring for many of the most severe pain generating conditions, with [Plaintiff] referred to pain management.** He often checked "nl" or normal with regard to systems. Just prior to this medical source statement for example, he checked normal respiratory, normal cardiovascular, normal gastrointestinal, and normal mental status exam (judgment, insight, alertness, orientation, mood, recent/remote memory). He was not routinely checking neck, neurological or other abnormalities with his focus on hypertension, chronic obstructive pulmonary disease/asthma, Gastroesophageal reflux disease and sometimes depression/anxiety. **The doctor's explanation in his medical source statements, his treatment focus, and his own objective findings fail to support the extent of limitation he alleged in his statements. Furthermore, the pain management doctor who is treating [Plaintiff] for a variety of issues related to her pain complaints provides more detailed findings and evaluation of the imaging that fails to support the extent of limitation Dr. Kistler indicated. Other findings and evaluations noted in the record are also inconsistent with Dr. Kistler's opinion as previously highlighted.**

**He then completed a mental medical source statement related to mental functioning that includes definitions not consistent with social security disability standards indicating no specific mental health diagnoses.** For example, a "moderate" limit would preclude functioning 11-25% of the workday/week (compare 12.00 mental disorders). He then found her marked in most social interaction areas, most sustained concentration and persistence areas, and most adaptation areas. He wrote she could not handle stressful situations even while medicated and being counseled. Despite all these marked limitations, he found her capable of managing her own funds. While this doctor noted depression and anxiety complaints at times, this was often in the setting of normal mental status exam findings checked, with complaints that were not continuous and many notes of stability in his own treatment notes. **His notes fail to support the extent of limitations he alleged and the marked limitations he indicated are not consistent with other evidence of her mental health functioning in terms of treatment history, mental status exam findings and activities of daily living, making this opinion evidence unpersuasive as well.** [Plaintiff] had little mental health treatment with a mental health professional and many normal mental status exam findings noted in her Columbus Area integrated health services notes as well as elsewhere.

(R. at 26-27 (internal citations omitted; emphasis added).)

Against that backdrop, Plaintiff argues that the ALJ "did not properly consider whether Dr. Kistler's opinions were supported." The Undersigned disagrees. With regard to both

17

Plaintiff's physical and mental condition, the ALJ repeatedly considered and discussed in detail the supportability of Dr. Kistler's opinions.  First, with regard to Dr. Kistler's diagnoses, the ALJ noted that "little objective evidence is cited in support and that which is cited is not supportive of the extent of limitation Dr. Kistler indicated."  (R. at 27.)  The ALJ noted that Dr. Kistler "was not primarily caring for many of the most severe pain generating conditions," and found that Plaintiff's pain management specialist (Dr. Sayegh) "provide[d] more detailed findings and evaluation of the imaging that fails to support the extent of limitation Dr. Kistler indicated."  (*Id.*)  These findings are supported by substantial evidence.

On this issue, Plaintiff points to Dr. Kistler's treatment notes, *see* R. at 1169-1179, a February 6, 2017 cervical spine MRI, R. at 1183, and Dr. Kistler's medical source statement, R. at 1379-1381, as evidence which Plaintiff argues is "far greater than what is included in most records."  (ECF No. 13 at PAGEID ## 1464-1465.)  Plaintiff's argument, however, fails to reconcile the deficiencies discussed by the ALJ, including most conspicuously the conflict between Dr. Kistler's opinion and that of the other medical experts, including Plaintiff's pain management specialist Dr. Sayegh.  As the ALJ observed, Dr. Sayegh wrote that Plaintiff "had near to normal imaging of the lumbar spine" and that "treatment with Norco and Lyrica was beneficial with [Plaintiff] showing improvement in functioning and quality of life."  (R. at 24 (citing R. at 1276-1279).)

The ALJ also discussed at length a May 29, 2019 evaluation by Thomas Edwin Baker, DO, which found that Plaintiff "ha[d] good range of motion of the right and left knee and both hips," "had no instability of the collateral cruciate ligaments," had intact neurovascular status, had no meniscal signs, had no deformity, had no masses about the knee, and indicated stability on imaging "with no significant joint effusion or any other abnormalities."  (R. at 23 (citing R. at

1301-1308).)  The ALJ added that Dr. Baker wrote "I do not see any indication for surgical intervention," and that Plaintiff's findings were "quite mild on exam, testing and imaging, with no progression of her mild degenerative joint disease of both knees and only conservative treatment ordered."  (*Id.*)  The ALJ concluded that "[t]hese exams fail to support the extent of limitations the claimant alleged due to her need and fail to support the need for an assistive device due to her knee degenerative joint disease," as Dr. Kistler opined.  (*Id.*)

As for Plaintiff's mental health, the ALJ appropriately dismissed Dr. Kistler's opinion that Plaintiff was "permanently [psychologically] disabled" as of September 2, 2005, *see* R. at 1168, by noting that "[i]n complete contradiction to [Dr. Kistler's opinion], [Plaintiff] was able to work home health care jobs for years well after [September 2, 2005] even up to substantial gainful activity levels."  (R. at 26 (citing R. at 229-232, 1168).)  This conclusion is clearly supported by substantial evidence.  For instance, the consultative psychologist, Dr. Smith, found Plaintiff to be far less restricted than Dr. Kistler had opined.  (R. at 1195-1202.)  Specifically, Dr. Smith noted "normal findings . . . with regard to [Plaintiff's] speech, thought processes, associations, insight, judgment and social skills," as well as his "concern that [Plaintiff] may not have performed optimally on testing."  (*Id*.)  Dr. Smith ultimately opined that "overall her abilities fall in the upper ranges of the confidence intervals."  (*Id.*)  The ALJ discussed all of this evidence including Dr. Smith's note that Plaintiff "was still found capable of being able to maintain concentration, persistence and pace to perform 2-step tasks," as well as her opinion that Plaintiff had no limitations with regard to social interaction.  (*Id.*)  Finally, the ALJ connected these notes and opinions to those of the State agency examiners, ultimately concluding that Dr. Smith and the State agency examiners' opinions "cited good supporting evidence and their assessments were reasonably consistent with other evidence in the record including hearing level

19

evidence." (R. at 30.)  The ALJ then directly compared the record evidence from Dr. Smith and the State agency examiners to that from Dr. Kistler, concluding that Dr. Smith and the State agency examiners' opinions "are in sharp contrast to [Dr. Kistler] who checked that she would be unable to function in nearly all work-related areas 26-50% of the workday/week." (*Id.*) Accordingly, the Court does not accept Plaintiff's argument that the ALJ failed to evaluate the supportability of Dr. Kistler's opinions.

To be clear, the question before the Court is not whether the ALJ *could* have found that the record contained evidence in support of Dr. Kistler's opinions, as Plaintiff seems to suggest. (*See* ECF No. 13 at PAGEID # 1464 ("Contrary to the ALJ's conclusions, the record does contain evidence in support of Dr. Kistler's opinions.").)  Rather, this Court is tasked with determining whether the ALJ's decision "is supported by substantial evidence and was made pursuant to proper legal standards." *Rabbers*, 582 F.3d at 651.  While Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for his RFC determination, and the ALJ's explanation enjoys substantial support in the record. *Dickinson v. Comm'r of Soc. Sec.*, No. 2:19-CV-3670, 2020 WL 4333296, at *11 (S.D. Ohio July 28, 2020), *report and recommendation adopted*, No. 2:19-CV-3670, 2020 WL 5016823 (S.D. Ohio Aug. 25, 2020) (citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")).  Under these circumstances, the Undersigned finds no merit to Plaintiff's statement of error.

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that

substantial evidence supports the ALJ's decision denying benefits, and that the ALJ's decision

was made pursuant to proper legal standards.  Based on the foregoing, it is therefore

**RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the

Commissioner's decision be **AFFIRMED.**

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report an\d

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation).  Even when timely objections are filed, appellate

review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:    <u>December 9, 2021</u>                              <u> /s/ *Elizabeth A. Preston Deavers*</u>
                                                          Elizabeth A. Preston Deavers
                                                          United States Magistrate Judge